628 P.2d 136 (1980)
The PEOPLE of the State of Colorado, Petitioner-Appellee,
In the Interest of C.A.K., a Child, and Concerning,
K.D.K., Respondent-Appellant.
No. 79CA0791.
Colorado Court of Appeals, Div. II.
December 31, 1980.
Rehearing Denied February 26, 1981.
Certiorari Granted May 18, 1981.
*137 Harden, Schmidt & Hass, P.C., Rick Zier and George Hass, Fort Collins, for petitioner-appellee.
Rebecca Elliott, Fort Collins, for respondent-appellant.
SMITH, Judge.
This is an appeal by K.D.K. from a decree terminating her parental rights relative to C.A.K., her daughter. We order that decree set aside.
K.D.K. is the natural mother of C.A.K., who was born on July 2, 1971. C.A.K. was reared by her mother until the age of five years, at which time K.D.K. voluntarily placed C.A.K. with the Larimer County Department of Social Services. On February 9, 1978, the People filed a petition alleging that C.A.K. was a neglected or dependent child in that the child lacked proper parental care and that her mother had failed to provide proper medical care for the child. Five days later, on February 14, 1978, the People filed a motion to terminate parental rights, alleging that K.D.K. was unfit as a parent in that her condition of borderline mental retardation rendered her unable to *138 afford the child reasonable care and guidance, and that all attempts at treatment of, and help for, K.D.K. had been unsuccessful.
At a hearing on November 1, 1978, the court found C.A.K. to be a dependent or neglected child as defined by § 19-1-103(20), C.R.S.1973 (1978 Repl. Vol. 8). On the following day, a second hearing was held to consider whether C.A.K. should be permitted to accompany the foster family, with whom she had resided for the previous nine months, to the State of Oregon, where they were permanently locating. At the conclusion of the hearing, the court directed that the child accompany the foster family to Oregon. The natural mother, who resided in Larimer County, continued in the programs ordered by the court to improve her parenting ability.
On June 14, 1979, a hearing was held on the question of termination of the parent-child legal relationship. At the conclusion of the hearing, the court terminated the parent-child relationship between K.D.K. and C.A.K.

I.
Rights of parents in their natural children are fundamental rights protected by the United States Constitution: The United States Supreme Court in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), addressed this issue, as follows:
"The rights to conceive and raise one's children have been deemed `essential.' Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), `Basic Civil Rights of Man,' Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), and `[r]ights far more precious ... than property rights,' May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, the equal protection clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)."
The Colorado appellate courts have likewise consistently considered termination of parental rights as a decision of the utmost gravity and seriousness. Overturf v. District Court, Colo., 602 P.2d 850 (1979); People in the Interest of M.B., 188 Colo. 370, 535 P.2d 192 (1975); People in the Interest of S.S.T., 38 Colo.App. 110, 553 P.2d 82 (1976); People in the Interest of K.S., 33 Colo.App. 72, 515 P.2d 130 (1973).
The public policy of Colorado directed toward preservation of the family unit is clearly expressed in the legislative declaration of purpose found in § 19-1-102(1), C.R.S.1973, (1978 Repl. Vol. 8) of the Children's Code:
"(1) (a) To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society;
(b) To preserve and strengthen family ties whenever possible, including improvements of home environment;
(c) To remove a child from the custody of his parents only when his welfare and safety or the protection of the public would otherwise be endangered ....
(d) To secure for any child removed from the custody of his parents the necessary care, guidance, and discipline to assist him in becoming a responsible and productive member of society."

II.
Termination of the parent-child legal relationship is governed by § 19-11-101 et seq., C.R.S.1973 (1978 Repl. Vol. 8) of the Children's Code. Section 19-11-105, C.R.S. 1973 (1978 Repl. Vol. 8) reads in pertinent part as follows:
(1) The court may order a termination of the parent-child legal relationship upon the finding of either of the following:

*139 (a) That the child is adjudicated dependent or neglected and all of the following exist:

(I) That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful;

(II) That the parent is unfit;
(III) That the conduct or condition of the parent or parents is unlikely to change within a reasonable time.
(2) In determining unfitness, conduct, or condition, the court shall find that continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or that the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care. In making such determinations, the court shall consider, but not be limited to, the following:
(a) Emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental, and emotional needs of the child;
(b) Conduct toward the child of a physically or sexually abusive nature;
(c) History of violent behavior;
(d) A single incident of life-threatening or gravely disabling injury or disfigurement of the child;
(e) Excessive use of intoxicating liquors or narcotic or dangerous drugs which affect the ability to care and provide for the child;
(f) Neglect of the child;
(g) Long-term confinement of the parent;
(h) Injury or death of a sibling due to proven parental abuse or neglect;
(i) Reasonable efforts by child-caring agencies which have been unable to rehabilitate the parent or parents.
(3) In considering any of the factors in subsection (2) of this section in terminating the parent-child legal relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child ...." (emphasis supplied)
Section 19-3-106(1), C.R.S.1973 (1978 Repl. Vol. 8), and C.R.J.P. 1 places the burden of proof upon the People to sustain their petition for termination by a preponderance of the evidence.
Appellant contends, inter alia, that the conclusions of the trial court that: (1) the treatment plan was unsuccessful, and (2) that the respondent's mental deficiency is of such duration and nature as to render her unlikely within a reasonable time to provide reasonable care for her child, are not supported by the evidence. We agree.

A. The Treatment Plan

At the termination hearing the court determined that the third and final treatment plan "although reasonably complied with by the respondent ... has not been successful as to her ...." The treatment plan provided as follows:
"1. [K.D.K.] will write two letters per month to her daughter, one by the 15th of the month and the other by the 30th of the month. She will contact her caseworker upon the completion of the letter, at which time her caseworker will visit the respondent and mail the letter. In this way, the respondent will be in touch with both her daughter and Social Services on a bi-monthly basis. This is to continue for a period of five months.
2. The [respondent] will be responsible for picking up the child and returning her on time for the visits that shall be arranged through the Court in the Spring of 1979.
3. During each of [the child's] visits home, a member of the Larimer County Mental Health Clinic will observe the interactions between [the respondent and her husband] and between [the child] and her mother, the latter for purposes of evaluating the mother/child attachment and parenting skills. This person will make appropriate recommendations as to parenting skills, and will provide a letter *140 to the Court concerning all observations. In the event that this person determines that the respondent and her husband should participate in marital counselling and recommends same, they shall participate on a regular basis with marital counselling or parental skills counselling as recommended.
4. [The respondent] will take responsibility for her own health by consulting a physician and maintaining any advised schedule of taking medication for a period of five months.
5. [The respondent] is responsible for obtaining a pediatrician for [the child] providing him with [the child's] medical records, and for responding in an appropriate way to any medical problems which may arise when [the child] is in her care.
6. [The respondent] will maintain the personal hygiene of [the child] when she is visiting. She will bathe her daily and return her in the same condition she was in at the start of the visit.
7. [The respondent] will attend counselling sessions at the Larimer County Mental Health Clinic on a bi-monthly basis. The emphasis of the therapy will be on self-sufficiency and parenting for a period of five months.
8. Due to previously suspected abuse of [the child] by her grandfather, ... [The respondent and her husband] will not allow the grandfather to see [the child] while she is visiting with them, unless [the respondent] is present. [The grandfather] may call the caseworker and arrange a supervised visit through the Department of Social Services if he wishes to see [the child].
9. [The respondent and her husband] will show financial stability at the next Court hearing by complying with the following:
a. Each will maintain consistent adequate income.
b. [The respondent and her husband] will show to the Court proof that they can pay the basic minimal expenses of a three person family: rent, utilities, food, medical expenses, and transportation, if the latter is needed for employment.
10. The [respondent and her husband] will find and maintain adequate housing by [the child's] March visit. "Adequate" means a bedroom for [the respondent and her husband] and one for any person who lives in the home for an appreciable length of time. The dwelling will have adequate heating and plumbing."
This treatment plan, on its face, does not provide a standard by which success can be measured. And, the trial court did not specify in its ruling the basis for its decision that the treatment plan was unsuccessful even though each of the specific requirements had been followed by K.D.K. and her husband.
Such defect is of considerable magnitude when considered in light of the purpose of the treatment plan. This purpose is well set forth in a letter written to Judge Dressel by a Larimer County Department of Social Services caseworker:
"I am writing the following treatment plan and ask that you approve it for a period of six months. The respondent was married to her husband in October. The two of them have expressed an interest in having C. return to their care. Therefore, I have written the following treatment plan as a guideline in determining conditions which need to be met before we can consider the return of the child to her natural mother and stepfather."
The clear import of this letter is that if the treatment plan requirements are fulfilled the child will be ultimately returned to its mother.
We hold that if a trial court intends the successful completion of a treatment plan as a condition for the return of a child, then the treatment plan must specify what the relevant criteria will be to determine success. Furthermore, we hold that if a trial court concludes that a treatment plan, although complied with, has been unsuccessful, it must make factual findings to support that conclusion.
*141 Here, the trial court neither specified in imposing the treatment plan what criteria it would consider in determining if the plan had been successful nor did it set forth any factual basis for its conclusion that it had been unsuccessful. Therefore, the trial court's conclusion that "although reasonably complied with the treatment plan was not successful" cannot become the basis of a decree terminating the parent-child relationship.

B. Mental Deficiency of K.D.K.

We next consider whether the trial court's conclusion that K.D.K.'s mental deficiency is of such duration and nature as to render her unlikely within a reasonable time to provide reasonable care for her child.
The People rely upon an intellectual and psychological evaluation of K.D.K. prepared approximately one year prior to the termination hearing, and prior to both the request for termination and the imposition of the final treatment plan. This report showed that K.D.K. was in the low-normal to mildly retarded range of intellectual functioning. That evaluation concluded that the appellant was a "grossly immature, unresourceful adult who displays little initiative and little ability to respond and act in a mature fashion", and who displays "extreme passivity and dependence on others."
At the termination hearing, however, a supervisor at the Department of Mental Health, who was an expert in clinical psychology, testified that subsequent to the initial evaluation and during the time he had worked with her, K.D.K.'s I.Q. had increased. He also testified that K.D.K. had the ability to learn parenting skills and apply them. The teacher in charge of the parenting classes which K.D.K. attended testified that she showed an ability to learn and retain the parenting skills taught in the classes.
The People did not present any evidence to contradict the testimony of these witnesses. Thus, they have not sustained their burden of proof with regard to the continuing nature of appellant's alleged mental deficiency. The evidence, therefore, does not support the trial court's determination that K.D.K.'s mental deficiency was of such duration and nature as to render her unlikely within a reasonable time to provide reasonable care for her child. On the contrary, it shows that she is a highly motivated, although not a highly intelligent, mother, who has demonstrated her desire and ability to improve her parenting skill level.
Under the wording of the statute, in order to terminate the parent-child legal relationship of K.D.K. and C.A.K., the People had the burden of proving, inter alia, both of the following: (1) "That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents, or has not been successful" and (2) "that the conduct or condition of the parent or parents is unlikely to change within a reasonable time." Section 19-11-105(1), C.R.S.1973 (1978 Repl. Vol. 8). We conclude that there was no basis for termination of the parent-child relationship under the statute. Thus, the decree of the trial court terminating the parent-child relationship between K.D.K. and C.A.K. must be and the same is hereby ordered set aside.

C. Directions on Remand

Having ordered the decree terminating the parent-child relationship set aside, we would be remiss if we did not deal with the continuing order of the trial court under which the child remains in the custody of foster parents who are no longer residents of the State of Colorado. Our decision here does not affect the prior decree of the trial court determining that C.A.K. is a "dependent and neglected" child. As long as she remains in that status the trial court has several placement options. Section 19-3-111(1), C.R.S.1973 (1978 Repl. Vol. 8). Implicit in each of these options, however, is the continuing jurisdiction of the court to supervise the custodian as well as the child. The ultimate desired end of all such placements should be the return of the child to its own home and existing parents. See *142 § 19-1-102(1), C.R.S.1973 (1978 Repl. Vol. 8). The existing order is thus not appropriate. The cause is therefore remanded with directions that the trial court enter such orders as will: (1) Secure the immediate return of the child to Colorado, and (2) provide for placement under such terms and conditions as are designed to ultimately reunite the mother with her child.
Decree terminating parent-child relationship set aside, and cause remanded with directions.
RULAND, J., concurs.
BERMAN, J., specially concurs.
BERMAN, Judge, specially concurring.
While I agree with the result the majority reaches in this case, there are aspects of the opinion which I believe need further discussion.
The record and transcript in this case are lengthy ones replete with evaluations and opinions expressed by social workers, psychologists, physicians, and teachers. Together, they paint a tragic picture. The evidence discloses a mother who in mid-adolescence gave birth to an illegitimate child. The mother is mildly retarded, with an I.Q. of 72. This diminished capacity, while not extraordinary in itself, appears to be coupled with a somewhat inadequate personality development on the part of the mother resulting from emotional deprivation in her own childhood.
This diminished capacity, together with the inexperience of youth, caused her, in the early years of the child's life, to make a number of inappropriate decisions with respect to the child. Several times she permitted the child to become exposed to potentially dangerous situations, and her own care of the child in several instances demonstrated her own lack of knowledge and understanding, particularly in the area of personal hygiene.
However, no place in the record is there any indication that the mother has physically abused the child or knowingly permitted others to do so. Nor has she intentionally or through any lack of caring on her part subjected the child to any emotional abuse. On the contrary, the record discloses without exception that the relationship between the mother and child has always been a warm, caring, loving, and affectionate one. Nowhere in the record is there any indication that the mother has had any desire not to care for, or be a parent for, her child.
Even in 1976, when the mother voluntarily agreed to placement of her child in a foster home it was with the idea that doing so was in the best interests of the child; that is, she believed that by temporarily placing the child she would have time to improve her parenting skills. This continued to be her goal as these placements were renewed in 1977 and 1978. During this time the mother continued to maintain a close, warm, and loving relationship with her daughter, albeit apparently recognizing her inability to act as a full-time parent. But the loss of parental rights was certain and the die was cast when the trial court permitted the child to be removed to Oregon in the custody of the foster parents who had previously indicated their desire to adopt the child.
This case approaches the limit to which society should go in insuring that each child be provided with the most adequate parents, or be guaranteed a home environment likely to insure that that child will grow to realize his, or her, full potential. We have said before that the statute does not "vest in our social agencies a theomorphic power to determine the most appropriate parents for any given child." People in the Interest of S.S.T., 38 Colo.App. 110, 553 P.2d 82 (1976). Nor does such theomorphic power reside in the courts or the legislature to use at will.[1]
I do not quarrel with the need or right of society to inject itself into a family's life, in a proper case, for the purpose of providing a supportive and protective structure for the child. But, that purpose cannot be pursued *143 so broadly as to abolish or abridge fundamental personal liberties when the end can be achieved by narrower means. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). And, it is axiomatic that the guarantee of constitutional rights is not to be determined by its cost; thus, once the state does inject itself into a family's life, it must assume the burden of furnishing the necessary supportive and protective structure.
Indisputably, C.A.K.'s welfare would be served, now and in the future, by preservation and encouragement of the tender, loving relationship she enjoys with her mother, even though that may not be sufficient to supply the totality of the child's developmental needs. That relationship is, in my view, the single most significant factor in determining whether the child will become a happy, well-adjusted adult. The State can more easily supply mechanisms to meet the child's other developmental requirements than it can the love of a parent for a child, and of a child for its parent.
When an order of termination of parental rights is made, the child henceforth is, for all purposes legal and practical, dead to the parents affected. Indeed, they have lost the right to see that child again, or even to know of its whereabouts. Section 19-11-108, C.R.S.1973. See Adoption of Harvey, 375 Pa. 1, 99 A.2d 276 (1953); see generally People in the Interest of J.L.W., infra. Because of these dire results, "the interest of a parent in the companionship of his ... children should `come to [our] Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic [conditions].'" Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (Frankfurter, J., concurring); See Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
Finally, it is because of the sensitive nature of the constitutional rights with which we are concerned, and which the majority recognizes, that I disagree with the majority holding that the proper burden of proof here is by a preponderance of the evidence.
"In Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) the Supreme Court held that to meet due process demands, the standard for use in a commitment for mental illness must be greater than by a preponderance of the evidence. In so holding the court noted it had used the ` "clear unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases.' Those cases involved deportation and denaturalization.
"I do not believe that parental rights are of any less concern than those involved in deportation, denaturalization, or civil commitment cases. Neither, therefore, should the standards applied in the proceeding to terminate parental rights be any less rigorous than the ones the U.S. Supreme Court has mandated in the cases mentioned. Under civil commitment cases the possibility of release and cure usually exists, but here the termination of the parental rights of the mother means that for her the children are as though dead. There can be no undoing of this fact."
People in the Interest of J.L.W., (Colo.App. # 79CA0322, October 9, 1980) (not selected for official publication) (Berman, J., dissenting).
NOTES
[1] See People in the Interest of J.L.W., (Colo. App. # 79CA0322, October 9, 1980) (not selected for official publication) at page 8, footnote 1 (Berman, J., dissenting).