652 P.2d 603 (1982)
The PEOPLE of the State of Colorado, Petitioner,
In the Interest of C.A.K., A Child, and Concerning K.D.K., Respondent.
Nos. 81SC85, 81SC86.
Supreme Court of Colorado, En Banc.
October 18, 1982.
*604 Harden, Schmidt & Hass, Rick Zier, Fort Collins, for petitioner.
David Bye, Fort Collins, for C.A.K. in No. 81SC86.
Lach & Elliott, P.C., Rebecca Elliott, Fort Collins, for respondent.
ROVIRA, Justice.
We granted certiorari to review a decision of the Colorado Court of Appeals which reversed a judgment of the district court terminating the parental rights of K.D.K. See People in the Interest of C.A.K., 628 P.2d 136 (Colo.App.1980). We reverse.

I.
K.D.K. is the mother of C.A.K. who was born in July 1971 when K.D.K. was fifteen years old and unmarried. In 1972 K.D.K. had another child who was relinquished by K.D.K. shortly after its birth.
The paternity of C.A.K. has never been established. The alleged father has failed to enter an appearance, and his default was entered early in the proceedings.
K.D.K.'s first contact with the Department of Social Services was in Adams County in 1972 when she was pregnant with her second child. At that time, she applied for Aid to Dependent Children for C.A.K. and herself. Subsequently, she left the state with C.A.K. Upon returning in 1974, she again applied for assistance, and C.A.K. was placed in day care as a protective service due to her physical condition.
In August 1975 K.D.K. voluntarily placed C.A.K. in foster care, and she remained with a foster family until December 1976. From December 1976 to March 1977, K.D.K. and C.A.K. lived with K.D.K.'s father and stepmother, but this arrangement was not satisfactory, and in April 1977 C.A.K. was placed in the care of another foster family. This arrangement lasted until December 1977 when K.D.K. once again made arrangements to have C.A.K. live with her. This time mother and daughter were together *605 approximately six weeks. In January 1978 K.D.K. placed C.A.K. with her parents, and K.D.K. went to live with her grandfather. In February 1978 C.A.K. was once again placed with a foster family.
On February 9, 1978, the People filed a Petition for Neglected or Dependent Children in which they alleged that C.A.K. lacked proper parental care through the actions and omissions of her parent; K.D.K. failed to provide C.A.K. with proper and necessary medical care; C.A.K.'s environment was injurious to her health; and K.D.K. had allowed others to mistreat and abuse C.A.K. without taking lawful means to stop such mistreatment. The petition stated that termination of the parent-child relationship was a possible remedy if the petition was sustained.
Contemporaneously, the People filed a "Motion for Temporary Custody" and attached to their motion a report of the Larimer County Department of Social Services (LCDSS) and a report of the Thompson School District R-2 school psychologist.[1] In support of their motion, the People alleged that the child was living in an unstable home situation, was exposed to abusive and violent conditions, and that C.A.K. had suffered serious regression in her social and academic development.
K.D.K. waived her right to a hearing as to temporary custody. The court ordered temporary custody of C.A.K. to be placed in the LCDSS and appointed guardians ad litem for both K.D.K. and C.A.K. and counsel to represent K.D.K. On February 14, 1978, the People filed a "Motion to Terminate Parental Rights," alleging, inter alia, that K.D.K. was an unfit parent due to brain damage which rendered her unable to give the child reasonable care; that K.D.K. had neglected the child's medical needs; and that the child's home environment was injurious.
In June 1978 a treatment plan[2] was approved by all parties, and the court ordered both K.D.K. and C.A.K. to be examined by a psychologist or psychiatrist and C.A.K. to undergo a medical examination.
K.D.K. demanded a jury trial on the issue of whether C.A.K. was a dependent or neglected child, but on November 1, 1978, the day set for trial, K.D.K. admitted paragraph 5(b) of the petition, to-wit, that C.A.K. lacked proper parental care through the omission of her parent. Counsel for K.D.K. stipulated that the reports in the court's file could be considered as the factual basis for paragraph 5(b), and the court sustained the petition.[3]
*606 A placement hearing was then conducted to determine whether C.A.K. should remain in the home of the foster parents with whom she had been living since February 1978. These parents were, due to the husband's employment, being transferred to Oregon. K.D.K. objected to the child's leaving the state, and substantial testimony was heard concerning the appropriate placement of C.A.K. All counsel stipulated that the testimony presented at the placement hearing could be considered by the court at any future hearing regarding termination of parental rights.
In its extensive findings of fact, the trial court stated that prior to placement with the foster parents C.A.K.'s physical and mental condition had deteriorated to a critical state due to the omissions of K.D.K.; subsequent to her placement with the foster parents, there was a dramatic improvement in C.A.K.'s physical and mental condition; and although K.D.K. expressed her love for C.A.K. and wanted the child to live with her, allowing C.A.K. to be in the custody of her mother would not be in the best interests of the child. The court ordered that C.A.K. be allowed to move to Oregon with her foster parents and requested that the parties propose a plan of visitation for the court's consideration.
A short time later, a second treatment plan was developed with participation of counsel for C.A.K., K.D.K., and the People. The parties stipulated to its approval by the court.
The treatment plan recognized that it was in the best interest of C.A.K. and in furtherance of the goal of reconciliation of the child with K.D.K. that K.D.K. comply with the plan. The plan required K.D.K. to write two letters per month to her daughter and contact her caseworker upon the completion of the letters so that K.D.K. would keep in touch with both her daughter and the Department of Social Services. Further, K.D.K. would be responsible for picking up and returning C.A.K. on her visits, and representatives of the Larimer County Mental Health Clinic would observe both C.A.K. and K.D.K. during these visits. The plan required K.D.K. to be responsible for her own health care and that of C.A.K. when she was in her care; to attend counseling sessions at the Larimer County Mental Health Clinic; and to establish, along with her present husband, the ability to provide for basic minimal needs of a three-person family.
In June 1979 a hearing was held to determine whether the child-parent relationship between C.A.K. and K.D.K. should be terminated. At this hearing, pursuant to stipulation, the court considered testimony given at the November 1978 placement hearing. There was conflicting testimony as to whether K.D.K. successfully completed the treatment plan and whether her mental condition had improved sufficiently to allow her to care for C.A.K. properly.
The trial court concluded that the treatment plan had not been successful, that K.D.K.'s condition was unlikely to change within a reasonable time, and that she was an unfit parent. Consequently, the court ordered her parental rights terminated.
K.D.K. filed a motion to amend judgment or for a new trial. She alleged there was insufficient evidence to support the court's findings of fact and the court erred in applying sections 19-1-102, 19-3-111, XX-XX-XXX, and XX-XX-XXX, C.R.S.1973 (1978 Repl.Vol. 8). The motion was denied. The court of appeals reversed, holding that the treatment plan was insufficient because it did not specify what the relevant criteria would be to determine success and the evidence did not support the trial court's determination that K.D.K.'s mental deficiency was of such duration and nature as to render her unlikely within a reasonable time to provide reasonable care for C.A.K.

II.
In her motion for new trial, K.D.K. did not raise the issue of whether the termination of her parental rights under a preponderance of the evidence standard violated due process of law. However, we elect to address the issue because of its constitutional significance.
*607 In People in the Interest of A.M.D., 648 P.2d 625 (Colo.1982), we held that the preponderance of the evidence standard violates due process of law and, consistent with Santosky v. Kramer, ___ U.S. ___, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), clear and convincing evidence is the appropriate constitutional standard in proceedings involving termination of a parent-child relationship.
The question left unanswered in People in the Interest of A.M.D., supra, is whether the rule should be made retrospective, or whether its effect should be prospective only. Of course, the rule will be neither purely prospective nor completely retrospective. A purely prospective rule does not apply even to the parties in the case where the rule was announced. See England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). On the other hand, a completely retrospective application would govern even those cases where termination proceedings are final and appellate review is either completed or barred.
The United States Constitution neither requires nor prohibits retrospectivity, so each state may determine the issue for itself, absent a specific mandate to the contrary. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). We are not, however, without guidance on the issue.
A proceeding terminating parental rights is a civil one, and the standard for retroactive application of decisions in civil cases was set out by the United States Supreme Court in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). First, the decision, if it is not to be applied retroactively, must establish a new rule of law. Second, the merits of each case must be weighed by looking to the purpose and effect of the rule in question and whether retrospective operation will further or retard its operation. Third, the inequity imposed by retroactive application must be weighed to avoid injustice or hardship.
As to the first factor, clearly a new rule of law was established, for prior to Santosky, supra, the preponderance of the evidence standard had been applied in termination proceedings. See People in the Interest of B.J.D., 626 P.2d 727 (Colo.App. 1981).
The factor from Chevron Oil Co. that argues most strongly for retroactivity is the secondthe purpose and effect of the clear and convincing standard. As we observed in People in the Interest of A.M.D., "the standard of proof directly influences the basic reliability of the factfinding decision concerning termination and clearly affects the substantial rights of the parties to the termination decree." 648 P.2d at 631.
On the other side of the balance is the third factorthe inequity and hardship imposed by retroactive application of our decision. The interests to be protected in a termination of parental rights case include the interests of the parent and child in a continuing family relationship; the interests of the parent in preserving the integrity and privacy of the family unit; the interest of the child in a permanent, secure, stable, and loving environment; and the interests of the State in protecting the child. Department of Social Services v. Ronald P., 28 Cal.3d 908, 623 P.2d 198, 171 Cal.Rptr. 637 (1981). By the time a termination proceeding has wound its way through appellate proceedings, no one benefits from a retrial of the facts that served as a basis for the termination. In the context of a parental termination proceeding, finality of decision outweighs retroactive application of a new standard of proof.
We are not unmindful of the fact that a parental termination proceeding is not an ordinary civil proceeding. Indeed, that fact is the basis for our decision in People in the Interest of A.M.D., supra. The elevated standard of proof is evidence of the importance we attach to the truth-finding process. That we opt for nonretroactivity in this case is not to disparage the value we attach to the constitutional guarantee. Rather, it is to recognize the burdens that would be imposed by retroactivity.
*608 Even in the criminal context, decisions creating new rights that affect the truth-finding process are not automatically applied retroactively. In Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), which dealt with the question of retroactivity of the decisions in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court observed:
"[T]he question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree.... We are thus concerned with a question of probabilities and must take account, among other factors, of the extent to which other safeguards are available to protect the integrity of the truth-determining process at trial."
384 U.S. at 728-29, 86 S.Ct. at 1778-1779.
The Court also observed in a slightly different context:
"Despite the fact that procedures are related to the integrity of the fact-finding process in the context of [prison] disciplinary proceedings, where less is generally at stake for an individual than at a criminal trial, great weight should be given to the significant impact a retroactivity ruling would have on the administration of all prisons in the country, and the reliance prison officials placed, in good faith, on prior law not requiring such procedures."
Wolff v. McDonnell, 418 U.S. 539, 573-74, 94 S.Ct. 2963, 2983, 41 L.Ed.2d 935 (1974).
One commentator on the "retrospectivity-prospectivity" issue has pointed out that there are two justifications for a denial of retroactive effect. The first is the protection of persons who have relied on the earlier state of the law; the second is the protection of stability in areas where society attaches particular importance to stability. Currier, Time and Change in Judge-made Law: Prospective Overruling, 51 Va.L.Rev. 201 (1965).
The reliance factor is more persuasive when the change in the law at issue concerns pre-litigation conduct that becomes the subject of later litigation, because most acts, once done, cannot be undone. Consequently, it would often be inequitable to subject conduct to a standard that did not obtain when the conduct was engaged in. Here, the conduct that is governed by the change in the law can be undone. The case could be remanded for a new trial, and the parties would then begin again at square one.
It is the stability factor that more strongly mandates prospectivity here. By the time a termination proceeding reaches trial, the child has usually been subjected to a great deal of emotional trauma. As discussed in Part I of this opinion, C.A.K. has lived in numerous homes in her short life, and her family life has been uncertain at best. In such a case, there is much to be said for finality of decision so that the child can get about the business of growing up in her new home.
Justice Roger Traynor has observed that "[t]he conviction that a new judicial rule is more just than an old one is still likely to carry the topheavy inference that such a rule achieves maximum justice by retroactive application." Traynor, Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility, 28 Hastings L.J. 533, 535 (1977). An analysis of the reasoning in Santosky, supra, shows that the considerations militating in favor of a change in the law do not necessarily militate in favor of retroactivity, and that maximum justice may be achieved by a nonretroactive application.
In concluding that the clear-and-convincing evidence standard is constitutionally required, the Santosky court balanced the three factors set forth in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for analyzing due process issues. These factors are the private interests affected by the proceeding, the risk of error created by the State's chosen procedure, and the countervailing governmental interest supporting use of the challenged procedure.
*609 The Santosky court found that the first factorthe private interest affected weighed heavily against the use of the preponderance standard. However, the interest of the child is not affected as substantially by a rule, declared in advance, that the higher evidentiary standard be used, as it would be by a requirement that the child endure a second trial.
As to the second factorthe risk of errorthe Court found that the risk of erroneous fact-finding was not properly allocated by the preponderance standard. The weight of this factor does not change in the retrospectivity analysis.
As to the third factorthe countervailing government interestthe Court found that an elevated standard of proof would not create any real administrative burden for the state. While this is true when considered prospectively, when considered retrospectively, the requirement of two trials instead of one does place an administrative burden on the state. Moreover, the state has a parens patriae interest in the welfare of the child that may be impaired by subjecting the child to a second trial.
As a consequence of the reevaluation of the Eldridge factors with the retrospectivity question in mind, we believe that justice would not be served by a retroactive application of Santosky and People in the Interest of A.M.D. As a result, we will apply the new rule only to termination hearings which commenced after March 24, 1982, the date of the Santosky decision.

III.
In setting aside the decree terminating the parent-child relationship, the court of appeals held that "if a trial court intends the successful completion of a treatment plan as a condition for the return of a child, then the treatment plan must specify what the relevant criteria will be to determine success." People in the Interest of C.A.K., 628 P.2d at 140.
Section 19-11-105(1), C.R.S.1973 (1978 Repl.Vol. 8), of the Children's Code provides in pertinent part:
"Criteria for termination. (1) The court may order a termination of the parent-child legal relationship upon the finding of either of the following:
(a) That the child has been abandoned by his parent or parents as set forth in section 19-3-111(3);
(b) That the child is adjudicated dependent or neglected and all of the following exist:
(I) That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful;
(II) That the parent is unfit;
(III) That the conduct or condition of the parent or parents is unlikely to change within a reasonable time."
Here the parent-child relationship was terminated pursuant to section 105(1)(b); therefore, successful completion of a treatment plan was mandated by statute.
The second treatment plan approved by the court in this case provided as follows:
"1. [K.D.K.] will write two letters per month to her daughter, one by the 15th of the month and the other by the 30th of the month. She will contact her caseworker upon the completion of the letter, at which time her caseworker will visit the respondent and mail the letter. In this way, the respondent will be in touch with both her daughter and Social Services on a bi-monthly basis. This is to continue for a period of five months.
2. The [respondent] will be responsible for picking up the child and returning her on time for the visits that shall be arranged through the Court in the Spring of 1979.
3. During each of [the child's] visits home, a member of the Larimer County Mental Health Clinic will observe the interactions between [the respondent and her husband] and between [the child] and her mother, the latter for purposes of evaluating the mother/child attachment and parenting skills. This person will make appropriate recommendations as to parenting skills, and will provide a letter to the Court concerning all observations.

*610 In the event that this person determines that the respondent and her husband should participate in marital counselling and recommends same, they shall participate on a regular basis with marital counselling or parental skills counselling as recommended.
4. [The respondent] will take responsibility for her own health by consulting a physician and maintaining any advised schedule of taking medication for a period of five months.
5. [The respondent] is responsible for obtaining a pediatrician for [the child] providing him with [the child's] medical records, and for responding in an appropriate way to any medical problems which may arise when [the child] is in her care.
6. [The respondent] will maintain the personal hygiene of [the child] when she is visiting. She will bathe her daily and return her in the same condition she was in at the start of the visit.
7. [The respondent] will attend counselling sessions at the Larimer County Mental Health Clinic on a bi-monthly basis. The emphasis of the therapy will be on self-sufficiency and parenting for a period of five months.
8. Due to previously suspected abuse of [the child] by her grandfather, . . . [the respondent and her husband] will not allow the grandfather to see [the child] while she is visiting with them, unless [the respondent] is present. [The grandfather] may call the caseworker and arrange a supervised visit through the Department of Social Services if he wishes to see [the child].
9. [The respondent and her husband] will show financial stability at the next Court hearing by complying with the following:
a. Each will maintain consistent adequate income.
b. [The respondent and her husband] will show to the Court proof that they can pay the basic minimal expenses of a three person family: rent, utilities, food, medical expenses, and transportation, if the latter is needed for employment.
10. The [respondent and her husband] will find and maintain adequate housing by [the child's] March visit. "Adequate" means a bedroom for [the respondent and her husband] and one for any person who lives in the home for an appreciable length of time. The dwelling will have adequate heating and plumbing."
The trial court found that although reasonably complied with, the treatment plan was not successful. Further, it found that K.D.K. was unfit to be a parent because her mental deficiency was of such duration and nature as to render her incapable within a reasonable time of caring for the physical, mental, and emotional needs of the child. It also noted that reasonable efforts were made by child-caring agencies to rehabilitate K.D.K. but were to no avail.
As the court of appeals indicated, the treatment plan did not expressly provide a standard by which success was to be measured. However, we do not believe that section 19-11-105, C.R.S.1973 (1978 Repl.Vol. 8 and 1981 Supp.), requires an express statement of such standards. Rather, the success or failure of the treatment plan must be viewed with an eye toward the purpose of the plan; the goals of the Children's Code; and the standards expressed in the code relating to the parent's fitness, conduct, and condition.
The purpose of a treatment plan is to attempt to help the parent overcome those difficulties which led to a finding that the child was neglected or dependent. See People in the Interest of B.J.D., 626 P.2d 727 (Colo.App.1981). It represents an affirmative attempt by the state to preserve the parent-child relationship whenever possible. This goal is expressed throughout the Children's Code.[4]
*611 Further, section 19-11-105, which expressly addresses the termination of parental rights, contains criteria to be considered by the court in making the necessary determinations under the provision. Subsections 105(2) & (3) provide:
"(2) In determining unfitness, conduct, or condition, the court shall find that continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or that the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care. In making such determinations, the court shall consider, but not be limited to, the following:
(a) Emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental, and emotional needs of the child;
(b) Conduct towards the child of a physically or sexually abusive nature;
(c) History of violent behavior;
(d) A single incident of life-threatening or gravely disabling injury or disfigurement of the child;
(e) Excessive use of intoxicating liquors or narcotic or dangerous drugs, which affect the ability to care and provide for the child;
(f) Neglect of the child;
(g) Long-term confinement of the parent;
(h) Injury or death of a sibling due to proven parental abuse or neglect;
(i) Reasonable efforts by child-caring agencies which have been unable to rehabilitate the parent or parents.
(3) In considering any of the factors in subsection (2) of this section in terminating the parent-child legal relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and order, if necessary, an evaluation of the child's physical, mental, and emotional conditions."[5]
Under section 105(1)(b), a treatment plan must be approved by the court prior to any termination of parental rights. Further, the language of section 105(1)(b)(I) clearly contemplates that a plan, although complied with, may not be successful.[6]
The fact that an individual fulfills the tasks and duties enumerated in the treatment plan does not mean that the individual will be able to meet his responsibilities as a parent. In many cases, it would be impossible to devise a plan under which success could be guaranteed. Successful completion necessarily requires that the quality of the parent's participation be evaluated. Further, an assessment of the parent's underlying abilities would have to be made.
Implicit in the legislative scheme is the fact that the standards to be applied in determining the ultimate success or failure of a treatment plan are those found in the Children's Code itself. The plan, as an attempt to aid the parent, can only be judged to be successful if it results in rendering the parent fit or it corrects the conduct or condition which led to intervention by the state into the parent-child relationship. Accordingly, no explicit criteria to determine success need be included in the treatment plan itself.

IV.
The court of appeals, in reversing the judgment of the trial court, concluded *612 that the People had not sustained their burden of proof with regard to the continuing nature of K.D.K.'s mental deficiency.
A careful examination of the record, including the testimony and exhibits received at the November 1978 placement hearing and the June 1979 termination hearing, discloses substantial evidence to support the findings of the trial court that K.D.K.'s mental deficiency was of such duration and nature as to render her unlikely, within a reasonable time, to provide reasonable care for the child.
In May 1978, subsequent to the filing of the petition for termination and pursuant to court order, Gladys Wolff, a staff psychologist at the Center for Therapeutic Learning, examined K.D.K. and testified at the November 1978 hearing. Her examination revealed that K.D.K. had a full scale I.Q. of 74, which placed her around the 4th or 5th percentile on age norms and in the borderline deficient range of intelligence. Further, K.D.K. was a grossly immature, unresourceful adult who displayed extreme passivity and dependence on others. The report concluded by noting that K.D.K. had borderline deficient intellectual skills; she had minimal ability to profit from experience and therefore integrate old and new learnings and observations into a logical sequence of events; if given custody of C.A.K., she would require frequent monitoring and observation; and, that as C.A.K. progressed into adolescence, K.D.K. would lack the judgment and maturity to plan, communicate, and apply consequences and restrictions in a developmentally meaningful way.
Rachael Moriarity, a pediatric psychologist for the Larimer County Mental Health Center, was a witness for the People at the June 1979 termination hearing. She testified that she had worked with C.A.K. for two years. During that time, although K.D.K. was being assisted by the LCDSS and taking parenting classes at the mental health center, she had observed little change in the parenting skills of K.D.K.
Moriarity also observed the interaction between mother and child when C.A.K. visited her mother on two occasions in January and March 1979. She was of the opinion that K.D.K.'s condition had not and would not change within a reasonable period of time, and C.A.K. would suffer mental and behavioral deterioration if returned to the care of K.D.K.
Patricia Adams, a caseworker for the LCDSS who had worked with K.D.K. and had observed mother and child during the January and March 1979 visits, also testified for the People. Her testimony, which reflected her own experience with K.D.K. and the efforts of the LCDSS for approximately six years, was supportive of the People's position that K.D.K.'s condition was chronic and unlikely to change within a reasonable time.
Dr. John Black, a clinical psychologist, testified on behalf of K.D.K. He first saw K.D.K. in October 1978 and approximately every two weeks thereafter. He agreed with the numerical results of the test performed by Gladys Wolff in May 1978 and was of the opinion that K.D.K. had a learning disability and was mildly retarded. Although Dr. Black felt that the testing was accurate, he was of the opinion that the conclusions included some cultural bias and that K.D.K.'s mental deficiency would not prevent her from parenting a child.
Dr. Black recognized that K.D.K. could not be an adequate parent without a great deal of community help. This assistance would include a homemaker, a caseworker, a medical doctor, and frequent contacts by K.D.K. with a clinical psychologist. He further agreed, in response to a question from the court, that both K.D.K. and the LCDSS would be doing the parenting of C.A.K. and K.D.K. would need continual guidance and support for parenting purposes. He also stated that if K.D.K. were given custody of C.A.K., foster parent care could not be ruled out in the future.
Delores Hopkins, a psychiatric nurse employed by the Larimer County Mental Health Center, was also called as a witness by K.D.K. She testified that K.D.K. had attended a mother's self-concept group from July through December 1978 and was *613 able to understand the principles and problems discussed in the group sessions and gave signs of growth and learning. Hopkins had never seen C.A.K. and K.D.K. together and could not give an opinion of K.D.K.'s parenting ability. In response to an inquiry from the court, Hopkins stated that she had not talked to K.D.K. between December 1978 and the termination hearing in June 1979 and had no way of knowing whether K.D.K. had retained, or was capable of applying, the information she had been exposed to in the parenting group sessions.
The trial court heard substantial, though in part conflicting, evidence concerning K.D.K.'s mental deficiency and whether that deficiency was of such duration and nature as to render her unlikely, with a reasonable time, to care for the physical, mental, and emotional needs of C.A.K.
We have often stated that the credibility of witnesses, the sufficiency, probative effect and weight of the evidence, and the inferences and conclusions to be drawn therefrom are all within the province of the trial court, whose conclusions will not be disturbed on review unless so clearly erroneous as to find no support in the record. Gebhardt v. Gebhardt, 198 Colo. 28, 595 P.2d 1048 (1979); Adler v. Adler, 167 Colo. 145, 445 P.2d 906 (1968). We find no such error here. The trial court's findings and conclusions are amply supported by the record.
The judgment of the court of appeals is reversed.
NOTES
[1] The report of the Larimer County Department of Social Services, dated February 3, 1978, recited in detail the background and circumstances of K.D.K. and C.A.K. The Thompson School District R-2 psychologist's report noted that C.A.K. was repeating kindergarten, her academic adjustment seemed to be affected significantly by emotional problems, she lacked confidence, and had a short attention span. It recommended a special program for C.A.K. including speech and language, visual motor skills, and continued therapy at the Larimer County Mental Health Center.
[2] The treatment plan required K.D.K. to:

(1) Attend and successfully complete a parenting class;
(2) Attend and cooperate with her training program at Foothills Gateway;
(3) Maintain adequate housing; and
(4) Take the initiative in arranging visitation with C.A.K.
[3] Section 19-1-103(20), C.R.S.1973 (1978 Repl. Vol. 8 & 1981 Supp.), defines neglected or dependent child as a child:

"(a) Whose parent, guardian, or legal custodian has abandoned him or has subjected him to mistreatment or abuse or whose parent, guardian, or legal custodian has suffered or allowed another to mistreat or abuse the child without taking lawful means to stop such mistreatment or abuse and prevent it from recurring;
(b) Who lacks proper parental care through the actions or omissions of the parent, guardian, or legal custodian;
(c) Whose environment is injurious to his welfare;
(d) Whose parent, guardian, or legal custodian fails or refuses to provide proper or necessary subsistence, education, medical care, or any other care necessary for his health, guidance, or well-being;
(e) Who is homeless, without proper care, or not domiciled with his parent, guardian, or legal custodial through no fault of such parent, guardian, or legal custodian;
(f) Who has run away from home, or is otherwise beyond the control of his parent, guardian, or legal custodian."
[4] The purpose of the General Assembly in enacting the Children's Code is expressed in section 19-1-102(1), C.R.S.1973 (1978 Repl.Vol. 8) as follows:

"(a) To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society;
(b) To preserve and strengthen family ties whenever possible, including improvement of home environment;
(c) To remove a child from the custody of his parents only when his welfare and safety or the protection of the public would otherwise be endangered; and
(d) To secure for any child removed from the custody of his parents the necessary care, guidance, and discipline to assist him in becoming a responsible and productive member of society."
[5] Section 19-11-105(2)(e), C.R.S.1973, was amended in 1981 by substituting the words "controlled substances" for "narcotic or dangerous drugs."
[6] See Note, Delineating the Reasonable Progress Ground as a Basis for Termination of Parental Rights, 28 De Paul L.Rev. 819 (1979).