Ricky Eugene CLARK, on behalf of himself and all others similarly situated, Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois Corporation, Defendant.

No. CIV.A. 00B1841PAC.

United States District Court, D. Colorado.

Dec. 19, 2003.

■■■■■■■■■■■■■■

L. Dan Rector, Leif Garrison, Robert Bruce Carey, The Carey Law Firm, Colorado Springs, CO, for Plaintiff.

Michael S. McCarthy, Katherine Megan Doberneck, Faegre & Benson, Denver, CO, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

BABCOCK, Chief Judge.

Plaintiff Ricky Eugene Clark brings claims for reformation of contract, breach of contract-failure to pay PIP benefits, breach of the duty of good faith and fair dealing, and willful and wanton breach of contract against Defendant State Farm Mutual Automobile Insurance Company ("State Farm"). The claims revolve around a July 18, 1996 incident in which Mr. Clark, a pedestrian, was struck by a car driven by Monica Madrid. The car was owned and insured by Monica Madrid's grandmother, Hortencia Madrid ("Mrs. Madrid").

On June 19, 2001, I granted State Farm's motion to dismiss, reasoning that *Brennan v. Farmers Alliance Mut. Ins. Co.*, 961 P.2d 550 (Colo.Ct.App.1998) did not allow Mr. Clark's reformation of contract claim to proceed because *Brennan* did not apply retroactively. The Tenth Circuit reversed and remanded with direction to "determine, through the exercise of [the Court's] equitable powers, the effective date of reformation," *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1242–43 (10th Cir.2003) and to "determine the amount of extended PIP benefits, if any, to which Clark is entitled." *Id.* at 1241. Pursuant to that remand a three day hearing was held November 3–5, 2003.

Significant evidence was developed during that hearing sufficient to determine the amount of extended benefits to which Mr. Clark is entitled. I hold that the date of reformation is the date of this Order and that Mr. Clark is entitled to the difference between the personal injury protection ("PIP") benefits he has received and the statutory aggregate $200,000 limit provided by the policy.

### I. Procedural Background

Mr. Clark brought claims in Pueblo, Colorado District Court for reformation of contract, breach of contract for failure to pay PIP benefits, breach of the duty of good faith and fair dealing, willful and wanton breach of contract, and deceptive trade practices pursuant to Colo.Rev.Stat. § 6–1–105(1)(e) and (g) against Defendant State Farm. State Farm removed the case to this Court on September 19, 2000.

In his complaint, Mr. Clark alleged that the coverage made available to him through Mrs. Madrid's insurance did not conform to Colorado law. He alleged that under *Brennan v. Farmers Alliance Mutual Insurance Co.*, 961 P.2d 550 (Colo.Ct. App.1998) he is entitled to unlimited medical and rehabilitative benefits, in addition to 100 percent of his lost income for an unlimited time.

State Farm moved to dismiss, contending that *Brennan* did not apply retroactively to allow reformation of the Madrid policy. I granted the motion, reasoning that the Colorado Court of Appeals' rule in *Brennan* could not be applied retroactively and, therefore, could not apply to Mr. Clark's requested contract reformation because he was injured over a year before *Brennan* was decided. Also, because Mr. Clark's other claims were predicated on the theory that State Farm had an obligation to inform Mrs. Madrid of *Brennan's* effect, I reasoned, those claims likewise failed to state a claim upon which relief

could be granted. I granted State Farm's motion and dismissed all of Mr. Clark's claims.

On appeal, the Tenth Circuit concluded that *Brennan's* rule must be applied not only prospectively, but also retroactively. *Clark v. State Farm Mut. Auto. Ins. Co.,* 319 F.3d 1234, 1242 (10th Cir.2003). Accordingly, the Tenth Circuit concluded,

> holdings in *Brennan* and *Thompson* [*v. Budget Rent–A–Car Systems, Inc.,* 940 P.2d 987 (Colo.Ct.App.1996)] mandate that the Madrid policy be reformed to include extended PIP benefits and that pedestrians, like Clark, must be included in the class of beneficiaries eligible to receive those benefits. The *Brennan* court, however, also concluded that the trial court has the discretion to ascertain the date of reformation because reformation is an equitable remedy.

*Id.* (internal citations omitted). *Clark* thus directed that "the district court ... determine, through the exercise of its equitable powers, the effective date of reformation." *Id.* at 1242–43. The Court also affirmed the dismissal of Mr. Clark's deceptive trade practice claim under the Colorado Consumer Protection Act. *Id.* at 1244. With respect to Mr. Clark's breach of contract, breach of the duty of good faith and fair dealing, and willful and wanton breach of contract claims, the Court noted that those claims "will remain viable only if the district court ... determines that reformation should occur as of a date preceding its order of reformation. Only under those circumstances would there be an extant contract, tort, or statutory duty to be breached." *Id.*

These findings of fact and conclusions of law follow the hearing held from November 3 through November 5, 2003. Given the somewhat unique nature of this proceeding, questions of law and fact are often mixed.

## II. Findings of Fact

### A. The 1996 Accident Involving Mr. Clark and Monica Madrid

On July 18, 1996, Mr. Clark was a pedestrian at the intersection of Highway 50 and Bonforte Boulevard in Pueblo, Colorado, when he was struck by a 1995 Subaru Impreza driven by Monica Madrid. The Impreza was owned by Monica Madrid's grandmother, Hortencia Madrid, who insured the vehicle with State Farm's basic "P1" level Personal Injury Protection ("PIP") coverage. Pursuant to that coverage, Mr. Clark received PIP payments for medical expenses, essential services, and 52 weeks of wage losses. For the reasons stated in Section IV D.2 *infra,* Mrs. Madrid's PIP coverage contains an aggregate limit of $200,000.

The State Farm PIP adjuster determined that Mr. Clark's pre-injury average weekly wage was $400 and under the "P1" calculation, calculated his wage loss compensation at $302.50 per week. State Farm timely paid those claims for 52 weeks until, pursuant to "P1" level limitations, it discontinued those benefits. The company closed Mr. Clark's wage loss file thereafter in July 1997. State Farm then marked the last payment as "final" and notified Mr. Clark that he was entitled to no more wage loss benefits. State Farm designated Mr. Clark's file as inactive in early 1998, having paid Mr. Clark wage loss benefits of $15,730, expenses of $48,617.48, and $3,376.50 for essential services. Essential services under the Madrid policy are "reasonable expenses incurred ... during the ***insured's*** lifetime for ordinary and needed services the ***insured*** would have performed without pay but for the ***bodily injury.***" (Emphasis in policy). It is only Mr. Clark's wage loss benefits that are at-issue here.

Mr. Clark remains unable to return to work in any capacity. On November 29,

2001, an Administrative Law Judge determined that Mr. Clark "has been under a disability as defined by the Social Security Act since July 18, 1996." Mr. Clark asserts that his inability to return to work entitles him to an additional $115,517.50 in extended PIP benefits for the 322 weeks following the date his basic PIP benefits were terminated in 1997. Because he will continue to suffer accident-related loss of income, he also asserts that he should receive wage-loss benefits at the extended PIP rate of $358.75 per week ($18,655 per year) for an indefinite period of time.

### B. The Madrid Policy

The Madrid Policy contains the following limitation:

> The most we pay for each *insured* who sustains *bodily injury* and the period of time from the date of the accident in which the services must be furnished or the loss of income incurred shall not exceed:
>
> 1. the amount and period of time shown in the Schedule applicable to each benefit under coverage symbol P1 if the *insured* is a *pedestrian.* This does not apply to *you, your spouse,* or any *relative.*
> 2. the amount and period of time shown in the Schedule applicable to each benefit under *your* coverage symbol for any other *insured.* All amounts and periods of time shown under coverage symbols P4, P8, P9 and P10 are subject to the Aggregate Limit shown.

(Emphasis in policy). The provision, known as the "Pedestrian Limitation," limited PIP coverage to the basic, or "P1" level for pedestrians. The Pedestrian Limitation limited coverage regardless of whether extended or basic coverage was selected by the named insured.

That limitation was first used by State Farm in 1975. At that time, the Colorado Division of Insurance required insurance companies doing business in Colorado to submit their proposed policy forms to the Division for approval. Pursuant to that requirement, State Farm had submitted its proposed policy endorsement "6291.1K— Personal Injury Protection Coverage" to the Colorado Division of Insurance on July 1, 1975. The Division approved the endorsement two weeks later on July 15, 1975. That original endorsement included the following language under the heading "Limits of Liability":

> If *bodily injury* is sustained in an accident by any *pedestrian* who is not the *named insured* or any *relative,* coverage shall be limited to that provided under coverage designation P1 of the Schedule of benefits.

(Emphasis in policy). State Farm's policy forms, though changing slightly over the next 23 years, would continuously maintain that limitation.

On June 30, 1992, the Division of Insurance advised Colorado auto carriers that Colorado would thereafter become a "certify and use" state. Under the "certify and use" policy, new insurance policies and endorsements were no longer subject to Division approval. From that date forward, insurers were required to certify that the insurer believed its policies, forms, or endorsements submitted to be legally compliant. An insurer could thereafter use the policy, form, or endorsement after a 30-day waiting period. In October 1993, pursuant to the "certify and use" policy, State Farm began using version 9806.4 of its State Farm Car policy, the policy form in place in the Madrid policy when Mr. Clark was struck by Mrs. Madrid's automobile.

At no time did the Colorado Division of Insurance withdraw its approval of the Pedestrian Limitation. Nor did that Division or any claimant, prior to 1998, object

to or raise any question concerning State Farm's Pedestrian Limitation.

### C. The History of Madrid Coverage with State Farm

Roger Madrid first purchased automobile liability insurance from State Farm on December 29, 1985. At that time, State Farm offered, and Mr. Madrid purchased, one form of extended PIP benefits ("P3" level benefits) which contained the Pedestrian Limitation. In 1986, Mr. Madrid reduced his PIP coverage from "P3" to "P1" basic coverage. Over the years, the Madrids bought and sold different vehicles, but continued to maintain their State Farm automobile insurance at the "P1" level. Then, in December 1994, the Madrids changed the named insured on their insurance policy to Hortencia Madrid, Mr. Madrid's mother. Mr. Madrid died shortly thereafter. There was no evidence that State Farm presented Mrs. Madrid with a renewed offer for extended PIP benefits. Rather, evidence suggested that State Farm simply continued the insurance options selected by Mrs. Madrid's son.

### D. Brennan v. Farmers Alliance Mutual Insurance Company

On January 8, 1998, the Colorado Court of Appeals issued its decision in *Brennan v. Farmers Alliance Mutual Insurance Co.*, 961 P.2d 550 (Colo.Ct.App.1998). That decision became final when the Colorado Supreme Court denied certiorari on August 24, 1998. *Brennan* interpreted the Colorado Auto Accident Reparations Act ("CAARA") to require insurance companies to offer extended PIP benefits that cover all classes of the "insured," including pedestrians. *Id.* at 554. Because Farmers did not offer extended benefits which included pedestrians, *Brennan* upheld the trial court's reformation of the Farmers contract to incorporate extended PIP benefits to injured pedestrians. *Id.* The *Brennan* Court also approved the lower court's

prospective only contract reformation, noting that "under such circumstances, it is not inappropriate to apply such interpretation prospectively." *Id.* at 556.

In reaction to *Brennan*, between January and November 1998, State Farm modified its insurance language to eliminate its Pedestrian Limitation. It sent notice of the change and a copy of the endorsement to all of its policyholders. State Farm also modified its claims processing and began to provide pedestrians with coverage as if no Pedestrian Limitation were contained in its policies. Those pedestrian claimants thus were afforded the same level of PIP benefits as those purchased by the policyholder under whose policy they received benefits. State Farm did not attempt to notify third-party beneficiaries whose claims were inactive because of its understanding that *Brennan* only applied prospectively.

At hearing, State Farm introduced substantial and credible evidence that the *Brennan* decision was not anticipated by the insurance industry or by State Farm. Everett Truttmann, head of the policy forms group at State Farm, testified that prior to *Brennan*, State Farm, in reliance on regulatory approval, presumed its Pedestrian Limitation to be valid. State Farm also introduced evidence to show that prior to the *Brennan* decision, at least two other insurance companies also issued insurance policies that contained Pedestrian Limitations. Mr. Clark, meanwhile, introduced evidence showing that some companies elected not to have Pedestrian Limitations prior to the *Brennan* decision.

Mr. Clark brought suit alleging, *inter alia*, that the Madrid policy should be reformed under *Brennan* to provide him with extended PIP benefits. State Farm moved to dismiss. I granted the motion, reasoning that *Brennan* could not be ap-

plied retroactively. The Tenth Circuit reversed in *Clark v. State Farm Mutual Automobile Insurance Co.*, 319 F.3d 1234 (10th Cir.2003). The case proceeds on remand to determine in equity the effective date of contract reformation and, as a result, the amount of extended PIP benefits, if any, to which Mr. Clark is entitled. Additional factual determinations are set forth as necessary in my legal analysis.

### III. Law

In Colorado, when Mr. Clark's accident occurred, the CAARA governed the legal rights of automobile accident victims and their insurers. *See Nationwide Mut. Ins. Co. v. United States*, 3 F.3d 1392, 1394 (10th Cir.1993). Though the CAARA was recently repealed, it is undisputed that its provisions govern the present dispute as they were in effect at the time of Mr. Clark's accident. The CAARA was a no-fault statute designed to "avoid inadequate compensation to victims of automobile accidents." Colo.Rev.Stat. § 10–4–702 (1997). It required that owners of motor vehicles maintain minimum insurance coverage on their vehicle(s), *see* Colo.Rev.Stat. § 10–4–705 (1997), including no-fault personal injury protection. PIP protection provided reasonable and necessary medical care, rehabilitative care, lost wages, and death benefits in the event of an accident. *See* Colo.Rev.Stat. § 10–4–706(1)(b)–(e) (1997). This required coverage applied to: (1) the named insured, (2) resident relatives of the named insured, (3) passengers occupying the insured's vehicle with the consent of the insured, and (4) pedestrians who were injured by the covered vehicle. Colo.Rev. Stat. § 10–4–707(1) (1997); *see also Brennan v. Farmers Alliance Mut. Ins. Co.*, 961 P.2d 550, 553 (Colo.Ct.App.1998).

Specifically, Colo.Rev.Stat. § 10–4–706, which detailed the minimum required coverage, required insurance carriers to provide:

Compensation without regard to fault, up to a limit of fifty thousand dollars per person for any one accident, for payment of all reasonable and necessary expenses for medical ... and nonmedical remedial care and treatment ... performed within five years after the accident for bodily injury arising out of the use or operation of a motor vehicle ...

*id.* at (1)(b)(I);

Compensation without regard to fault up to a limit of fifty thousand dollars per person for any one accident within ten years after such accident for payment of the cost of rehabilitation procedures or treatment and rehabilitative occupational training necessary because of bodily injury arising out of the use or operation of a motor vehicle ...

*id.* at (1)(c)(I); and

Payment of benefits equivalent to one hundred percent of the first one hundred twenty-five dollars of loss of gross income per week, seventy percent of the next one hundred twenty-five dollars of loss of gross income per week, and sixty percent of any loss of gross income per week in excess thereof, with the total benefit under this subparagraph (I) not exceeding four hundred dollars per week, from work the injured person would have performed had he not been injured during a period commencing the day after the date of the accident, and not exceeding fifty-two additional weeks
. . . .

*id.* at (1)(d)(I).

The CAARA also required that an insured be permitted a choice of increased coverage. Colo.Rev.Stat. § 710(1) (1997). That provision required insurers to offer to policy holders the option of increasing his or her policy to provide:

(I) Compensation of all expenses of the type described in section 10–4–706(1)(b) without dollar or time limitation; or

(II) Compensation of all expenses of the type described in section 10–4–706(1)(b) without dollar or time limitations and payment of benefits equivalent to eighty-five percent of loss of gross income per week from work the injured person would have performed had such injured person not been injured during the period commencing on the day after the date of the accident without dollar or time limitations.

*Id.* at 10–4–710(2)(a). "[T]he directive of §§ 10–4–710[was] to the insurer, not to the insured: all that [was] required [was] that the insurer *offer* these extended benefits." *Brennan,* 961 P.2d at 554 (emphasis in original).

Section 710 did not state to whom this increased coverage applied. An open question prior to 1998, therefore, was whether the categories of those required to be "insured" under section 707(1) applied to section 710's mandate to offer extended PIP coverage. That question was first considered by the Colorado Court of Appeals in *Brennan v. Farmers Alliance Mutual Insurance Co.,* 961 P.2d 550 (Colo.Ct.App. 1998).

In *Brennan,* Farmers Insurance Company offered section 710 extended coverage to the named insured. *Brennan,* 961 P.2d at 552. That offer, however, did not include extended PIP coverage for pedestrians. *Id.* Farmers was sued by a pedestrian who was injured in an accident with the named insured and received only basic PIP coverage pursuant to the policy's restrictions. *Id.* at 552. The trial court ruled that section 710's requirement applied to all of section 707's categories of "insured," including pedestrians. *Id.* Therefore, under section 710's terms, insurers were required to give their named insured the option of increasing coverage for injured pedestrians beyond the statutory minimum dictated by section 706. *See Brennan,* 961 P.2d at 554. Because those

extended benefits for pedestrians were not offered initially to the named insured, the district court reformed the contract to provide extended PIP benefits to the pedestrian plaintiff. *Id.* at 552. The district court dismissed the remainder of the claims, however, because its prospective-only reformation did not leave unfulfilled any of the contract, tort or statutory duties alleged. *Id.* at 556. The Colorado Court of Appeals agreed that this reformation was a matter of equity, and affirmed the district court's exercise of discretion in reforming the contract. *See id.* at 555–56. The Court also noted that Farmers used a standard industry form endorsement, the CAARA was unclear on this issue, and no appellate court had yet determined whether section 710 applied to pedestrians. *Id.* at 556. The appellate court then concluded, "under such circumstances, it is not inappropriate to apply such interpretation prospectively," and upheld the district court's dismissal of Brennan's other claims. *Id.* at 556–57.

In my Order regarding State Farm's motion to dismiss, I took *Brennan's* "prospective" statement restricting *Brennan's* application to mean what it said—it applies prospectively only. Because Mr. Clark's accident occurred before *Brennan,* I granted the motion. On appeal, the Tenth Circuit reversed, concluding that "the interpretation of section 710 contained in *Brennan* must be applied retroactively." *Clark,* 319 F.3d at 1242. The Tenth Circuit applied the retroactivity standards in *People ex rel. C.A.K.,* 652 P.2d 603 (Colo. 1982), and concluded that those standards required retroactive application. *Clark,* 319 F.3d at 1242. The *Clark* Court noted *Brennan's* conclusion that in Colorado, "when ... an insurer fails to offer the insured optional coverage that satisfies [CAARA], additional coverage in conformity with the offer mandated by statute *will* be incorporated into the policy." *Clark,*

319 F.3d at 1241 (quoting *Brennan*, 961 P.2d at 554) (emphasis in *Clark*). *Clark* held that because State Farm did not offer Mrs. Madrid the option of purchasing extended PIP benefits that included extended pedestrian coverage, Mr. Clark "is entitled as a matter of law to reformation of the Madrid policy to include extended PIP benefits." *Clark*, 319 F.3d at 1241.

*Clark* further noted that the *Brennan* court also "concluded that the trial court has the discretion to ascertain the date of reformation because reformation is an equitable remedy." *Clark*, 319 F.3d at 1242; *Brennan*, 961 P.2d at 556. Thus, "[a]s in *Brennan*, the district court in this case must determine, based on the particular circumstances presented here, the effective date of reformation for the Madrid policy." *Clark*, 319 F.3d at 1242.

It continued,

[T]he effective date of reformation is an equitable decision to be determined by the trial court based on the particular circumstances of each case. On remand, the district court should decide as an initial matter the effective date of reformation. Possible effective dates of reformation include, but are not necessarily limited to, the following: (1) the date the Madrid policy was issued; (2) the date the trial court in *Brennan* reformed the policy; (3) the date of the *Brennan* decision; and (4) the date the district court on remand reforms the contract.

*Clark*, 319 F.3d at 1243.

*Clark* further directed,

In exercising its equitable power, the district court should consider all appropriate factors, including the following: (1) the degree to which reformation from a particular effective date would upset past practices on which the parties may have relied and whether State Farm anticipated the rule in *Brennan*; (2) how reformation from a particular effective date would further or retard the pur-

pose of the rule in *Brennan*; and (3) the degree of injustice or hardship reformation from a particular effective date would cause the parties. These factors do not necessarily have equal weight but are to be evaluated on the basis of the strength of the equitable and policy considerations underlying each. Relevant evidence might include, for example, whether State Farm anticipated the *Brennan* decision, compiled information of *Brennan's* effect on claims processing, relied on the interpretation of CAARA rejected in *Brennan*, or had the ability to notify or considered notification of insureds and third-party beneficiaries about the *Brennan* decision.

*Clark*, 319 F.3d at 1243–44 (internal citations and quotations omitted). These factors were adapted from Colorado's retroactivity standards. *Id.* at 1244 n. 6.

The present question focuses upon whether retroactive contract *reformation* is appropriate—not, as in *Clark*, whether *Brennan* applies retroactively to affect Mr. Clark's insurance claim. The latter question has been answered in the affirmative by the Tenth Circuit. However, because the former question necessarily incorporates the latter, I discuss both.

■ State Farm contends that the appropriate effective date of reformation is the date of this Order. Mr. Clark asserts that the appropriate date of reformation is the day State Farm contracted with Mrs. Madrid to provide her insurance policy, but in any event, some time before the date of this Order. I consider the factors outlined in *Clark* below.

**IV. Analysis**

■ Clark's factors are "adapted from Colorado's test for determining whether a judicial decision should be applied retroactively." *Clark*, 319 F.3d at 1244 n. 6. Those factors were incorporated into Colo-

rado law by *People ex rel. C.A.K.,* 652 P.2d at 607, and originate from *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). As *Clark* noted, *Brennan* relied upon a retroactivity analysis in affirming the trial court's decision to apply contract reformation prospectively. *Clark,* 319 F.3d at 1244 n. 6. Hence, *Brennan* and *Clark* encourage that a court undergo a retroactivity analysis before determining whether a contract reformation should apply prospectively or retroactively. In considering the appropriate date of reformation, therefore, I consider *Clark's* adapted factors as well as the original *Huson* factors, where appropriate, for additional clarity.

A. *The Degree to Which Reformation from a Particular Effective Date Would Upset Past Practices on Which the Parties May Have Relied and Whether State Farm Anticipated the Rule in Brennan.*

■  *Clark's* first factor is adapted from the *Huson* test which requires, "First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed ...." *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 112 (Colo.1992); *Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). So, in considering the degree a particular reformation date upsets reliance on State Farm's past practice of incorporating its Pedestrian Limitation, I consider also to what extent State Farm could have predicted the decisions in *Brennan* and *Clark.* If those cases established unpredictable new obligations upon State Farm or decided issues of first impression that were not clearly foreshadowed, then reformation from an effective date that preceded either or both of those cases would dramatically upset past practices

because the company's reliance would have been more reasonable. Conversely, a predictable or clearly foreshadowed rule would not upset past practices, as the parties could plan for the rule's consequence. Underlying this analysis is the obvious concern that any insurer must be able to calculate premiums on an actuarially sound basis so as to sustain its ability to pay future claims.

### 1. Pre-Brennan Reformation Dates

Prior to *Brennan,* State Farm's practice—one upon which it "may have relied" (and indeed did rely)—was to include the Pedestrian Limitation in its no-fault PIP coverage policies. State Farm initially submitted the Pedestrian Limitation to the Colorado Division of Insurance for approval in 1975. It was approved. The company continued assuming the validity of the policy until 1992, when Colorado changed its insurance system to a "certify and use" system. Under that new system, companies certified that their policies complied with the law. They could then use the policy language at their own risk following a thirty-day waiting period. State Farm certified and used its Pedestrian Limitation in 1992. Evidence established that the entire regulatory process was rigorous and not a "rubber stamp" process. The provision was never denied or otherwise the subject of concern known to State Farm or anyone else. During this time at least two other companies—Farmers and Alliance—as well as the standard industry form endorsement, *see Brennan,* 961 P.2d at 556, all contained similar provisions that restricted pedestrian coverage. Testimony established that State Farm did not anticipate the *Brennan* rule. Taken together, this evidence showed State Farm's reasonable reliance on the interpretation of the CAARA that was ultimately rejected in *Brennan.*

That reliance, though ultimately incorrect, was well justified. As even *Brennan* noted, at the time the *Brennan* trial court first concluded that Pedestrian Limitations were invalid, "the No–Fault Act was unclear on this issue and no appellate court had yet determined whether § 10–4–710 ... applied to pedestrians." *Brennan*, 961 P.2d at 556. Because State Farm's interpretation of the CAARA and reliance on the validity of its Pedestrian Limitation prior to *Brennan* was reasonable and justified, a pre-*Brennan* reformation date would greatly upset its reliance upon its practice of incorporating that provision.

*2. Reformation Dates Between the Issuance of the Brennan and Clark Decisions*

Shortly after the *Brennan* opinion, State Farm changed its practices. First, State Farm eliminated its Pedestrian Limitation. Second, the company changed its claims-handling procedures by treating new and ongoing pedestrian claims as if the Pedestrian Limitation was not present in the named insured's contract. That change had the effect of providing injured pedestrians with the coverage level selected by the named insured. Third, State Farm— whether a conscious decision or not—declined to initiate research of its under-compensated past claimants like Mr. Clark who may have been retroactively eligible for extended PIP benefits. I consider each reaction separately.

*a) State Farm's First Reaction: Eliminating the Pedestrian Limitation*

*Brennan* clarified that the CAARA's section 710 "describes an option to purchase coverage, but at higher limits, for the same persons and under the same conditions applicable to mandatory basic PIP coverage [outlined in section 706]." *Clark*, 319 F.3d at 1239. State Farm's policies, like the coverage at issue in *Brennan*, did not offer extended coverage to

pedestrians because of its Pedestrian Limitation. In fall 1998, State Farm initiated a change in its policies to eliminate the Pedestrian Limitation. Assuming State Farm continued to make oral offers of extended PIP coverage to new policyholders, as was its practice, its subsequent and timely elimination of the Pedestrian Limitation negated the deficiency in its offers with respect to that group of people.

With respect to renewals, however, State Farm's elimination of the Pedestrian Limitation did not cure the deficiency. State Farm's practice was to offer extended benefits to new policyholders but not offer them again upon renewal. Customers who first began their policies prior to *Brennan*, such as Mrs. Madrid, therefore have not received an offer for extended PIP benefits that would cover pedestrians. State Farm's practice of eliminating the Pedestrian Limitation after the policy's issuance did not cure that deficiency with respect to renewed contracts. State Farm's reliance on this practice would not be disturbed by a date of reformation in the time period between the issuance of *Brennan* and the issuance of *Clark*.

*b) State Farm's Second Reaction: Treating Incoming Claims as if they Contained No Pedestrian Limitation*

The second practice State Farm altered in reaction to *Brennan* was with regard to its claims-handling procedures. After *Brennan*, State Farm began to treat its present and future pedestrian claimants as if the policies under which they were covered contained no Pedestrian Limitation. The effect of that practice was to provide injured pedestrians with the level of coverage selected by the named insured. Even after *Clark*, State Farm continues to assert that interpretation as the appropriate reading of *Brennan*. State Farm asserts now, as it did then, that the plaintiff in

*Brennan* received extended benefits not because of an insufficient offer, but because the named insured had selected extended benefits. But *Brennan* and *Clark* show otherwise.

As *Clark* noted,

In *Brennan*, the Colorado Court of Appeals concluded that "when . . . an insurer fails to offer the insured optional coverage that satisfies the [CAARA], additional coverage in conformity with the offer mandated by statute *will* be incorporated into the policy."

*Clark*, 319 F.3d at 1241 (citing *Brennan*, 961 P.2d at 554) (emphasis in *Clark*). The *Brennan* passage then cites *Thompson v. Budget Rent–A–Car, Systems, Inc.,* 940 P.2d 987 (Colo.Ct.App.1996), in which extended coverage was incorporated into a policy because no extended coverage whatsoever was offered to the insured. *Thompson,* 940 P.2d at 990 (*cited in Brennan,* 961 P.2d at 554). State Farm's position that the Pedestrian Limitation in *Brennan* was simply negated from the policy requires strained interpretation.

First, had *Brennan* negated that limitation, it would not have cited *Thompson*—a case in which additional coverage was incorporated for a failure to offer the extended coverage. *Compare Aetna Cas. & Sur. Co. v. McMichael,* 906 P.2d 92, 100–01 (Colo.1995) (negating an insurance policy clause that was void as against public policy). Indeed, *Thompson* had no specific provision that would have been appropriate to negate.

Second, *Brennan* premises its conclusion on the fact that "it is undisputed that Farmers did not offer extended coverage *which included pedestrians.*" *Brennan,* 961 P.2d at 554 (emphasis added). There, as here, the insurer offered extended coverage which *excluded* pedestrians. *Id.* at 552. *Brennan* made it clear that Colorado considers that type of offer to be no "offer"

at all with respect to coverage of that class of insured.

Finally, *Brennan* requires the remedy that the additional coverage "in conformity with the offer mandated by statute will be incorporated into the policy." *Id.* In whole, *Brennan* was clear that where an offer was made for extended PIP benefits, and that offer did not include extended pedestrian coverage, the appropriate remedy is to incorporate extended coverage for the pedestrian regardless of the named insured's policy level selection.

Though no evidence showed State Farm's misinterpretation to be deliberate, that misinterpretation is one factor that works in favor of a pre-*Clark* effective date of reformation. However, that early date is more appropriate for pedestrian claimants who claimed benefits after *Brennan,* only to be denied extended benefits due to State Farm's strained interpretation. Such claimants might include, for example, a claimant injured after *Brennan* who received basic PIP benefits although no offer for extended PIP benefits which included pedestrians was made to the named insured. This past practice of State Farm was not one upon which State Farm could reasonably rely because it required a strained interpretation of *Brennan.* I therefore conclude that a reformation date between the issuance of *Brennan* and *Clark* would upset this past practice of State Farm only nominally.

c) *State Farm's Third Reaction: Failure to Investigate Non–Active Claims*

Most pertinent to Mr. Clark, State Farm also interpreted *Brennan* to apply only prospectively. Of the State Farm employees who testified at trial, none testified to having contemplated informing past closed-file claimants of potential new benefits. State Farm Vice President Everett

Truttmann testified that State Farm believed *Brennan's* effect to be prospective only. I concluded as much in my Order to dismiss, and still find State Farm's reliance on this interpretation and practice reasonable for the time frame prior to *Clark*.

As *Clark* made clear, State Farm was wrong in its interpretation of *Brennan* that limited that case to prospective-only application. *Clark*, 319 F.3d at 1242. In reversing the dismissal of Mr. Clark's claims, the *Clark* court rejected two premises that State Farm advanced in support of limiting *Brennan* to prospective-only application. A close look at those two premises reveals the potential that *Clark* could have agreed with State Farm's "prospective only" interpretation of *Brennan*.

First, State Farm argued that *Brennan* explicitly states that its decision applies prospectively. *Clark*, 319 F.3d at 1241. The Tenth Circuit concluded that "Although *Brennan* included language that it was 'not inappropriate to apply [the trial court's] interpretation [of CAARA] prospectively,' this statement occurs in *Brennan's* discussion of the contract, tort, and statutory claims, and not the reformation claim, which the Colorado Court of Appeals authorized." *Id.* (quoting *Brennan*, 961 P.2d at 554). However, *Brennan* affirmed the dismissal of those claims *because* the reformation date was prospective only. *Brennan*, 961 P.2d at 556; *see also Clark*, 319 F.3d at 1244. *Brennan* concluded that those claims were appropriately dismissed because "until an insurance contract is reformed, the insurer has no obligation to conform to such 'reformed' policy." *Brennan*, 961 P.2d at 556. Although the statement *Clark* cites is contained in a discussion of contract, tort and statutory claims, its analysis is *reliant* on the reformation claim's prospective-only application. Because of that reliance, the *Brennan* section cited in *Clark* is not dicta.

I cannot determine State Farm's reliance on that passage to be unreasonable or consider *Brennan's* retroactive application to be "clearly foreshadowed."

Second, *Clark* discussed State Farm's argument that *Brennan* should not be applied retroactively because it did not satisfy Colorado's test for retroactivity. *Clark* reasoned that under the Colorado test for retroactivity, the first element was not satisfied. *Clark*, 319 F.3d at 1242. As discussed above, that element requires that "the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Clark*, 319 F.3d at 1242.

*Clark* held that,

State Farm's argument [that *Brennan* qualified as a "new rule of law"] must fail in light of the Colorado Supreme Court's decision in *Broyles v. Fort Lyon Canal Co.*[, 695 P.2d 1136 (Colo.1985).] In *Broyles*, the Colorado Supreme Court rejected the appellant's argument that a judicial decision should not be applied retroactively stating: "In *De Beque*, however, we did not establish a new principle of law. Rather, we merely interpreted and applied a statute that was enacted prior to the time Broyles was required to file his application. Accordingly, any contention that *De Beque* ... is inapplicable to this case is erroneous."

*Clark*, 319 F.3d at 1242 (quoting *Broyles*, 695 P.2d at 1144). The *De Beque* Court, cited in *Broyles*, interpreted the following statute:

In every fourth calendar year after the calendar year in which a determination is made with respect to a conditional water right, the owner or user thereof, if he desires to maintain the same, *shall obtain a finding by the referee of rea-*

sonable diligence in the development of the proposed appropriation, or said conditional water right shall be considered abandoned.

Colo.Rev.Stat. § 37–92–301(4) (1973) (*cited in De Beque v. Enewold,* 199 Colo. 110, 606 P.2d 48, 52 (1980)) (emphasis added).

*De Beque* upheld the trial court's conclusion that failure to comply with the provision resulted in the automatic loss of the party's conditional water rights. *Id.* at 54. In support of that decision, the Colorado Supreme Court cited the lower court's finding that,

The language of … [the] statute with respect to the effect of failure to file an application for a finding of reasonable diligence within the prescribed time is *clear* and *unequivocal:* … said conditional water right shall be considered abandoned. Taken together with the definition of abandonment of a conditional water right as found in C.R.S. (1973) 37–92–103, it is equally *clear* that an abandoned right is terminated. The *intent of the legislature is clearly expressed: there is no room for interpretation. The statute must be held to mean what it clearly says* … Cancellation of the conditional right is the appropriate remedy.

*De Beque,* 606 P.2d at 52 (emphasis added) (internal citations omitted).

The clarity of the *De Beque* statute contrasted with *Brennan's* observation that here, "the [CAARA] was *unclear* on this issue and no appellate court had yet determined whether § 10–4–710; enacted originally in 1973, applied to pedestrians," *Brennan,* 961 P.2d at 556 (emphasis added), highlights the reasonability of State Farm's errant interpretation that *De Beque* and *Broyles* did not foreclose the possibility of a statutory interpretation deciding "an issue of first impression whose resolution was not clearly foreshadowed."

*Lorenz,* 823 P.2d at 112; *Huson,* 404 U.S. at 106–07, 92 S.Ct. 349.

Because of the ambiguity that existed before *Clark* as to *Brennan's* retroactivity, the *Clark* court might have itself determined "an issue of first impression whose resolution was not clearly foreshadowed." *Lorenz,* 823 P.2d at 112. Indeed, testimony showed that the result in *Clark* was never anticipated. In light of that, upsetting State Farm's reliance on its errant interpretation of *Brennan* would greatly and unfairly upset its past practice of declining to research past and inactive claimants.

### 3. Mr. Clark's Reliance and Conclusion as to Element Number One

Mr. Clark showed no reliance on past practices that would be negatively affected by a later date of reformation. Moreover, he forewent physical therapy and occupational therapy benefits available to him, both of which presently remain available to him under the Madrid policy.

Because of the direct connection between his claim and State Farm's prospective reading of *Brennan,* Mr. Clark's claim is most properly analyzed with particular emphasis on State Farm's practice of declining to research past and inactive claimants. Mr. Clark did not file a claim with State Farm after *Brennan* was issued. Nor did he file his claim under a policy that had eliminated the Pedestrian Limitation. As noted above, State Farm's reliance on a "prospective" interpretation of *Brennan,* though ultimately incorrect, was reasonable. Reformation from a date before *Clark's* clarification of *Brennan's* retroactive application would therefore greatly upset State Farm's reliance on that interpretation. In balance, this first factor favors a date of contract reformation after the Tenth Circuit's opinion in *Clark.*

### B. How Reformation From a Particular Effective Date Would Further or Retard the Purpose of the Rule in Brennan.

*Clark's* second element is derived from *Huson's* second factor requiring that I "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Lorenz,* 823 P.2d at 112 (quoting *Huson,* 404 U.S. at 106–07, 92 S.Ct. 349). The purpose of the rule in *Brennan*—which was not identified in *Clark* or *Brennan*—is one that is difficult to define. Indeed, the rule itself is difficult to identify as *"Brennan . . .* did not announce a new rule of procedure or substantive law." *Clark,* 319 F.3d at 1242.

*Brennan* did do two things. It "construed [the] CAARA to require that extended PIP benefits be payable to pedestrians." *Id.* And "[b]ecause that coverage was not offered to the insured, the court applied the rule established in *Thompson* to conclude that the insurance contract must be reformed to include extended PIP benefits for pedestrians." *Id.* So, in order to define *Brennan's* "purpose," I look to the purposes of the rules *Brennan* applied: the CAARA and *Thompson.*

The purpose of the CAARA is "to avoid inadequate compensation to all victims of automobile accidents." *Brennan,* 961 P.2d at 553. The CAARA is therefore "to be liberally construed to further its remedial and beneficent purposes." *Id.* The purpose of *Thompson,* meanwhile, is not explicitly stated. "Generally, the purpose of reformation of an insurance contract is to make the policy express the true intent of the parties. However, when a policy is violative of a statute, reformation is also required to assure that coverage will meet the statutory minimums." *Thompson,* 940 P.2d at 990. The combined purpose of those two rules—and

thus the ultimate "purpose" of *Brennan*— is to avoid inadequate compensation to victims of automobile accidents and to further the CAARA's remedial and beneficent purposes by assuring that coverage meets the statutory minimums. *Brennan's* application furthers those purposes by providing incentive to insurance companies to provide greater coverage, and by furthering insurance coverage to specified pedestrians. Of course, such incentive must be counter-balanced by the insurer's ability to determine appropriate premium levels on an actuarially sound basis so as to sustain ability to pay claims on an ongoing basis.

*Brennan's* effect is likewise a challenge to fully identify. Much of the testimony at hearing assumed that Mr. Clark's date of contract reformation would automatically transpose to other insurance claimants. But only Mr. Clark's case and the Madrid policy are presently before me. At this time, therefore, I do not decide the effect Mr. Clark's reformation of the Madrid policy will have on other State Farm insurance contracts. However, if applied to other contracts, *Brennan's* effect could be significant. State Farm could be liable for—according to testimony by State Farm agents—thousands of injuries for which the company had no ability to predict the coverage risk and to collect premiums necessary to cover that risk. State Farm would also face a heavy administrative burden of researching past claimants. Testimony at hearing established that State Farm possesses the ability to research and retrieve those past claimants by two methods that differ in accuracy and efficiency.

Most efficiently, State Farm has the potential to research some pedestrian claims by computer. The "CSR" system—in place since 1996—would likely yield a majority of pedestrian claims. But because information regarding to whom payments

were made was not required in that system, some pedestrian claims would likely remain unidentified. A manual search of paper files, meanwhile, could yield all claimants. However, State Farm's evidence proved that process to be severely burdensome and time consuming. State Farm did not compile information of *Brennan's* effect on its claims processing, so the extent of that burden is not known to a certainty. Regardless, State Farm's obligation toward individual claimants owed extended benefits under *Brennan* would not likely change with the reformation date of the *Madrid* policy.

The CAARA's mandate of avoiding inadequate coverage arguably encourages a date of reformation from the time Mrs. Madrid first signed her policy. On the other hand, further ensuring that insurance coverage meets statutory minimums entails providing a deterrent for insurance companies that fail to comply with the law. That incentive works only where interpretations are predictable or foreshadowed. As I noted above, *Brennan* was not clearly foreshadowed. *See Brennan*, 961 P.2d at 556. Neither was *Clark*. Holding State Farm accountable would not deter State Farm or other insurance companies from any culpable behavior with respect to retroactive claims such as Mr. Clark's. This factor weighs partially in favor of a pre-*Brennan* reformation date, and partially in favor of a date following *Clark*.

C. *The Degree of Injustice or Hardship that Reformation from a Particular Date Would Cause the Parties.*

*Huson's* third factor allows, "[w]here a decision . . . could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Lorenz*, 823 P.2d at 112; *Huson*, 404 U.S. at 106–07, 92 S.Ct. 349. This is such a case.

As to State Farm, the degree of injustice and hardship yielded by a retroactive reformation would create an inequitable result. As I have noted throughout this opinion, evidence at hearing as well as *Brennan* itself show that the *Brennan* opinion was far from "clearly foreshadowed" and that State Farm did not predict the rule. Evidence also showed State Farm's practice of assessing its liability risk to accurately assess the proper premium amounts to cover future losses. Without having predicted the unforeseeable outcomes of *Brennan* and *Clark*, State Farm is left now without the ability to retroactively account for the liability to which it would be now exposed. Consequently, a retroactive reformation date inequitably would hold State Farm liable for coverage it could not foresee during a time it reasonably did not know of such exposure. In whole, a pre-*Brennan* or pre-*Clark* reformation date causes significant hardship and injustice to State Farm.

▇▇▇ As to the post-*Clark* time period, the date of this Order is the most equitable effective date of reformation. *Clark* clarified *Brennan*, directed that I determine the effective date of reformation, *Clark*, 319 F.3d at 1243, and directed that I determine "the amount of extended PIP benefits, if any, to which Clark is entitled." *Id.* at 1241. The decision regarding effective date of reformation is a discretionary and equitable decision based on the particular circumstances of each case. *Id.* at 1242–43. Therefore, though *Clark* gave State Farm notice that the Madrid policy would be "reformed to include extended PIP benefits," *id.* at 1242, State Farm had no knowledge at that time of what the effective date of reformation would be or what amount, if any, it would owe Mr. Clark. Holding State Farm liable for nonpayment in the time period after *Clark* and before this Order would therefore like-

wise be unjust. After all, "in insurance law, until an insurance contract is reformed, the insurer has no obligation to conform to such 'reformed' policy." *Brennan*, 961 P.2d at 556.

On balance, I find and conclude that the reformation of the Madrid policy should apply prospectively only. The Madrid policy is hereby reformed and the effective date of reformation shall be the date on which this Order is entered.

### D. Terms of the Reformed Contract

In this proceeding, both parties have asserted that the reformed contract must be interpreted to contain certain terms. Mr. Clark contends that, by operation of law, the terms of the reformed contract must provide him with extended PIP benefits unlimited in time. State Farm, on the other hand, contends that the contract should be reformed by simply deleting the Pedestrian Limitation from the policy. That would leave Mr. Clark with the benefits selected by Mrs. Madrid—"P1" level benefits he has received. I agree in part with Mr. Clark.

#### 1. Extended PIP Benefits

█ In *Clark*, the Tenth Circuit made clear that Mr. Clark is entitled to extended benefits. It explained,

In *Brennan*, the Colorado Court of Appeals concluded that "when . . . an insurer fails to offer the insured optional coverage that satisfies [CAARA], additional coverage in conformity with the offer mandated by statute *will* be incorporated into the policy." *Brennan*, 961 P.2d at 554 (emphasis added). It is undisputed that State Farm did not offer Hortencia Madrid the option of purchasing extended PIP benefits which covered injured pedestrians. Therefore, under *Brennan*, Clark is entitled as a matter of law to reformation of the Madrid policy to include extended PIP ben-

efits. *See id.* On remand, the district court must determine the amount of extended PIP benefits, if any, to which Clark is entitled.

*Clark*, 319 F.3d at 1241. It remains undisputed that State Farm did not offer Mrs. Madrid the option of purchasing extended PIP benefits which included extended coverage for pedestrians. As in *Thompson* and *Brennan*, the appropriate remedy is to include coverage that should have been offered. I therefore follow the law of this case and conclude that Mr. Clark is entitled to extended PIP benefits beginning on the day of reformation.

#### 2. The $200,000 Cap Applies

█ State Farm next contends that *Brennan* and *Clark* allow application of a $200,000 aggregate limit that is contained in the Madrid policy. Mr. Clark disagrees, asserting that the Madrid policy contains no such limitation. I agree with State Farm.

The *Brennan* court imposed an identical limitation, noting that,

A complying policy may provide that all benefits set forth in section 10–4–706(1)(b) to (1)(e) and in this section are subject to an aggregate limit of two hundred thousand dollars payable on account of injury to or death of any one person as a result of any one accident arising out of the use or operation of a motor vehicle.

*Brennan*, 961 P.2d at 555. "Thus, by its terms, § 10–4–710(2)(b) authorizes a complying policy to place an overall limit of $200,000 upon the total aggregate amount payable." *Id.*

As in *Brennan*, Mrs. Madrid's policy contains a $200,000 aggregate limit. The Madrid policy's section on no-fault coverage begins as follows:

*You* have [PIP] coverage if "P" with a number beside it appears in the "Cover-

ages" space on the declarations page. "P" with a number beside it is *your* coverage symbol. Check *your* coverage symbol in the Schedule for the limit *you* have chosen.

(Emphasis in policy). The policy then contains a chart showing the corresponding limits to each available coverage level. The Madrid policy declarations page contains the symbol "P1," giving the policy a "P1" limit. Thus, though Mrs. Madrid's coverage symbol limits her coverage to "P1," the *policy* includes extended PIP benefits under a different symbol—either "P4" or "P8." Both of those extended benefits coverages offer wage-benefit coverage of 100 percent of gross income up to $125 and 85 percent of gross income over $125. Both are subject to the $200,000 aggregate limit.

This Order reforms Mrs. Madrid's policy to include extended benefits under the "P4" coverage. This result is consistent with the admonition that a reformed insurance policy express the parties' true intent. *Thompson,* 940 P.2d at 990. Under the terms of that coverage, Mr. Clark's benefits are subject to a $200,000 aggregate limit. Mr. Clark is awarded the difference between what he has received and $200,000. *See Brennan,* 961 P.2d at 552.

### 3. Calculation of Mr. Clark's Award

State Farm has paid Mr. Clark $48,617.48 in expenses, $15,730 for loss of income, and $3376.50 for essential services. Those payments total $67,723.98. Mr. Clark is now awarded the remainder of the Madrid policy's $200,000 aggregate limit, $132,276.02.

### V. Mr. Clark's Remaining Claims

■ As *Clark* noted, the viability of Clark's breach of contract, breach of the duty of good faith and fair dealing, and willful and wanton breach of contract claims depends on the effective date of reformation. These con-

tract, tort, and statutory claims, however, will remain viable only if the district court in the exercise of its equitable power determines that reformation should occur as of a date preceding its order of reformation. Only under those circumstances would there be an extant contract, tort, or statutory duty to be breached. Conversely, if reformation is ordered to correspond to the date of entry of the order of reformation, there would be no pre-existing duty to pay extended PIP benefits.

*Clark,* 319 F.3d at 1244 (citing *Brennan,* 961 P.2d at 556–57).

The reformation entered herein causes the dismissal of Mr. Clark's remaining claims.

### VI. Rule 54(b) Certification

■ The Court of Appeals has jurisdiction to consider an appeal under 28 U.S.C. § 1291 only when the district court has entered a final judgment or when it has certified an issue for appeal under Fed. R.Civ.P. 54(b). *See Hutchinson v. Pfeil,* 105 F.3d 566, 569 (10th Cir.1997). Under 28 U.S.C. § 1291 and Rule 54(b), a district court decision is not considered a "final judgment" unless it " 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Utah v. Kennecott Corp.,* 14 F.3d 1489, 1492 (10th Cir.1994) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)). Before that time, final judgment may be entered only upon "express determination that there is no just reason for delay and upon an express direction for the entry of judgment." *See Hutchinson,* 105 F.3d at 569. Once a claim has been properly certified, jurisdiction is imparted to the appeals court. *See id.* The granting of a Rule 54(b) motion is left to the sound discretion of the trial court. *See Curtiss–Wright Corp. v. Gen. Elec. Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 64

L.Ed.2d 1 (1980). In making its decision, the court "must take into account judicial administrative interests as well as the equities involved." *Id.*

■ This Order resolves all claims between State Farm and Mr. Clark. However, Mr. Clark also seeks class certification on behalf of all others similarly situated. The Madrid policy's date of reformation and the amount of benefits Mr. Clark receives, among other considerations, will be crucial to any class certification analysis. Resolution of the issues addressed here on appeal inform that analysis. In the interest of judicial administration, I find that there is no just reason for delay, and direct that judgment be entered in this case.

Accordingly, IT IS ORDERED that:

1. The Madrid policy is REFORMED to include extended, "P4" level, PIP benefits for pedestrians;

2. The effective date of reformation shall be the date this Order is entered;

3. The Madrid policy's extended, "P4" level, PIP benefits are subject to the $200,000 aggregate limit on that coverage;

4. Mr. Clark is awarded the sum of $132,276.02;

5. Mr. Clark's claims for breach of contract, breach of the duty of good faith and fair dealing, and willful and wanton breach of contract are DISMISSED; and

6. Pursuant to Rule 54(b), final judgment shall be entered on the issues resolved herein.